## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | **Bankruptcy No. 21-20791-CMB** |
| | : | |
| **Samuel A. Rosenberg and** | : | |
| **Christine E. Rosenberg,** | : | **Chapter 7** |
| | : | |
| Debtors. | : | |
| | : | |
| | : | |
| **LWBC, LLC, as successor in interest** | : | **Adversary Pro. No. 21-02092-CMB** |
| **to Dollar Bank, Federal Savings Bank,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Related to Doc. No. 1** |
| | : | |
| **Samuel A. Rosenberg and** | : | |
| **Christine E. Rosenberg,** | : | |
| | : | |
| Defendants. | : | |
| | : | |

*Appearances:* Justin Tuskan for Plaintiff LWBC, LLC, as successor in interest to Dollar Bank, Federal Savings Bank
Francis Corbett for Defendants Samuel A. Rosenberg and Christine E. Rosenberg

## <u>MEMORANDUM OPINION</u>

The matter before this Court is the *Complaint to Determine Dischargeability of Debts* ("Complaint," Doc. No. 1)[1] filed by LWBC, LLC, as successor in interest to Dollar Bank, Federal Savings Bank ("LWBC"). Upon consideration of the credibility of the witness, the plausibility of the testimony, the record in this case, and for the reasons set forth herein, this Court finds that both Debtor Samuel A. Rosenberg and Debtor Christine E. Rosenberg must be denied a discharge pursuant to 11 U.S.C. §727(a)(4)(A).

---

[1] Pursuant to 28 U.S.C. §§157 and 1334, this Court has subject matter jurisdiction. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(J). Furthermore, the parties stipulate that this matter is a core matter upon which the bankruptcy court may enter final judgment. *See Joint Status Report*, Doc. No. 18 at ¶ 3.

## **Background and Procedural History**

On April 2, 2021, Samuel A. Rosenberg ("Debtor Husband") and Christine E. Rosenberg ("Debtor Wife") (collectively, the "Debtors"), filed a voluntary petition seeking relief under Chapter 7 of the Bankruptcy Code (the "Main Case," Case No. 21-20791-CMB). The Chapter 7 Trustee ("Trustee"), Rosemary C. Crawford, held a Meeting of Creditors, as required under 11 U.S.C. §341, on May 10, 2021 ("Meeting of Creditors"). At or around the time of the Meeting of Creditors, assets were discovered that were either not initially disclosed or were disclosed but there was a question as to their value. The Trustee was involved in investigating these assets.

In the meantime, on August 23, 2021, LWBC, as a creditor of the Debtors, commenced this adversary proceeding (the "Adversary Case") by filing the Complaint objecting to Debtors' discharge under 11 U.S.C. §727(a)(4)(A) pursuant to 11 U.S.C. §727(c)(1). In the Complaint, LWBC identifies several purported misstatements and omissions in Debtors' schedules and initial statement of financial affairs ("SOFA") including: (1) the acreage and value of property owned by Debtors located in Ligonier, Pennsylvania ("Ligonier Property") in Debtors' Schedule A/B; (2) the omissions of an oil and gas lease and related royalties in Debtors' Schedules G and I, respectively; and (3) the initial omission of three firearm transfers in Debtors' SOFA. Debtors deny and/or try to explain away these allegations. *See Answer to Complaint,* Doc. No. 8.[2]

While the Adversary Case was pending, the Trustee entered into a settlement agreement ("Settlement Agreement") with the Debtors, which was approved by *Order Approving Trustee's Motion to Approve Settlement* entered by default on November 17, 2021. *See* Doc. No. 52 in the Main Case. The Settlement Agreement provided for a sum to be paid to the bankruptcy estate in

---

[2]      Unless otherwise noted, citations are to documents filed in Adv. No. 21-02092-CMB.

lieu of the Trustee selling certain assets identified therein. Further, there was no mention of a 11 U.S.C. §727 action or dischargeability set forth therein.

A trial ("Trial") on this matter was held via video conference on June 2, 2022. During the Trial, LWBC's Counsel presented LWBC's case primarily through the presentation of exhibits and the examination of Debtor Husband as a witness. Debtor Husband was sworn in and offered testimony that either refuted the allegations made by LWBC in the Complaint or attempted to provide justifications for the Debtors' actions. After LWBC concluded its case, Debtors presented their own exhibits to the Court and again called Debtor Husband as a witness. While the Court found Debtor Husband's testimony at Trial related to the alleged misstatements about the acreage and value of the Ligonier Property to be credible, it did not find his statements related to the initial omission of the firearm transfers and the complete omissions of the oil and gas lease and accompanying royalties credible. Although Debtor Wife was present in the same room as Debtor Husband and Debtors' Counsel during the Trial, she was not called as a witness by LWBC or Debtors' Counsel.[3]

After the Trial, LWBC was instructed to file a statement with the Court clarifying whether the relief sought under 11 U.S.C. §727(a)(4)(A) was against both Debtor Husband and Debtor Wife, or only Debtor Husband. *See Order*, Doc. No. 32. Pursuant to the filed *Notice Clarifying Relief Sought by Plaintiff* (Doc. No. 36), LWBC is seeking relief under 11 U.S.C. §727(a)(4)(A) against both Debtor Husband and Debtor Wife. Thereafter, on July 29, 2022, *Defendants' Proposed Findings of Fact and Conclusions of Law* (Doc. No. 39) and *Plaintiff's Proposed Findings of Fact and Conclusions of Law* (Doc. No. 40) were filed. At that time, this matter was taken under advisement. This matter is now ripe for decision.

---

[3]    *See* Trial Transcript at 4-6. Citations to the *Transcript of Trial* (Doc. No. 34) transcribing the audio of the Trial shall be identified herein as "Trial Transcript" with reference to the relevant page number(s) therein.

### Findings of Fact

LWBC and the Debtors stipulated to the following background facts in their *Joint Status Report* (Doc. No. 18) ("Stipulation"). In 2018, Dollar Bank, Federal Savings Bank (the "Original Lender") extended a standby line of credit to INPAX Academy, LLC[4] (the "Borrower"). *See* Stipulation at ¶ 4. At that time, the Borrower operated a shooting range in McCandless, Pennsylvania. *See id.* at ¶ 11. Subsequently, the standby line of credit was converted to a term loan and a note evidencing the standby term loan was executed. *See id.* at ¶¶ 4, 5. As security for repayment of all monies owed, Debtors executed an Open-End Mortgage ("Mortgage") in favor of the Original Lender granting a mortgage lien on Debtors' residence located at 911 Cedarcrest Court, Wexford, PA 15090. *See id.* at ¶ 6. Per the terms of their agreement, the Debtors personally guaranteed all obligations and liabilities of the Borrower under the Mortgage. *See id.* at ¶ 7. "In or about April of 2020, the Borrower ceased substantially all of its business operations." *See id.* at ¶ 11. Afterwards, the Mortgage was assigned by the Original Lender to LWBC. *See id.* at ¶ 10. The dispute between Debtors and LWBC arose when Borrower and Debtors defaulted under the terms of the various agreements for, among other reasons, their failure to pay LWBC. *See id.* at ¶ 12.

As indicated above, on April 2, 2021, Debtors filed a voluntary Chapter 7 bankruptcy petition along with the required schedules and SOFA. *See* Exhibit A at 1-45; Exhibit B at 46-51.[5] LWBC is challenging the Debtors' discharge due to numerous alleged misstatements and omissions in the Debtors' schedules and SOFA. Debtor Husband testified at Trial that he provided the

---

[4]    INPAX Academy, LLC is a prior company that was owned by Debtor Husband. *See* Trial Transcript at 39.
[5]    Per the *Order* entered April 21, 2022 (Doc. No. 23), the Court instructed the parties to pre-mark their exhibits with LWBC using exhibit letters and Debtors using exhibit numbers. Collectively, LWBC's exhibits number pages 000001 through 000191, and Debtors' exhibits number pages D-1 through D-29. Therefore, references herein are made in accordance with those page numbers.

information contained within the filed schedules; as stated, Debtor Wife did not testify at Trial.[6] However, the Debtors filed a *Declaration About An Individual Debtor's Schedules* acknowledging that "[i]f two married people are filing together, both are equally responsible for supplying correct information," and both Debtor Husband and Debtor Wife signed under penalty of perjury to the truthfulness of the information contained within the schedules. *See* Trial Transcript at 14-15; Exhibit A at 45. This same language appears within the filed SOFAs, which Debtors also signed under penalty of perjury that the answers contained therein were true and correct. *See* Trial Transcript at 34-35; Exhibit B at 46, 51.

> Acreage and Value of the Ligonier Property

Part 1 of a Schedule A/B form requires a debtor(s) to disclose whether they own or have any legal or equitable interest in any residence, building, land, or similar property, and to accurately describe each specific asset in detail. In their filed Schedule A/B, Debtors list the Ligonier Property as being ten acres and having a current value of $10,000. *See* Exhibit A at 3. However, LWBC alleges that "[t]he Debtors' statements regarding the total size and value of the Ligonier Property were knowingly false." *See* Complaint at ¶ 19.

By deed dated November 26, 2008 ("Deed"), the Ligonier Property was conveyed to the Debtors by "Christine E. Knupp, now by marriage Christine E. Rosenberg," being Debtor Wife, and Donald G. Knupp and Brenda M. Knupp, husband and wife, being the Debtor Wife's parents.[7] *See* Exhibit C at 52-53. Despite listing the Ligonier Property as only ten acres on their Schedule A/B, the Deed describes the Ligonier Property as containing 13.449 acres. *See id.* at 53. Although

---

[6]    To the extent that Debtor Husband's testimony could be interpreted that he solely provided the information within the schedules to the exclusion of Debtor Wife's input, the Court does not find that credible. *See* Trial Transcript at 14.

[7]    The Deed states that Christine E. Knupp is the daughter of Donald G. Knupp and Brenda M. Knupp. *See* Exhibit C at 53.

Debtor Husband acknowledged that he is a party to the Deed and the Ligonier Property is indeed 13.449 acres, he testified that at the time the bankruptcy schedules were completed he did not know that the Ligonier Property was larger than ten acres and he did not have the deed in his possession at that time to state the contrary. *See* Trial Transcript at 16-18.

Relating to the value of the Ligonier Property, LWBC argued at Trial that the Debtors knew at the time they filed their schedules that the Ligonier Property was worth significantly more than $1000 per acre based on the comparative market analyses from Loyalhanna Realty and Vernon Realty. *See* Trial Transcript at 21-29; Exhibit D at 56-69; Exhibit E at 70-96. The Loyalhanna Realty and Vernon Realty comparative market analyses (collectively, the "Market Analyses") estimated the sale price of the Ligonier Property to be approximately $2868 and $3417 per acre, respectively. *See* Exhibit D at 62, 65-66; Exhibit E at 75, 77-78. However, Debtor Husband clarified that the Market Analyses were not in the Debtors' possession at the time they completed their bankruptcy petition and were not obtained until after the Meeting of Creditors when questions were raised by LWBC's Counsel as to the value of the Ligonier Property. *See* Trial Transcript at 26. Further, Debtor Husband credibly testified that he estimated the Ligonier Property's value as being approximately $10,000, or $1000 an acre, after seeking guidance on the value from his father-in-law, Donald G. Knupp. *See* Trial Transcript at 20-21. Mr. Knupp not only lives on the property adjacent to the Ligonier Property, but he is also one of the grantors of the Deed. *See* Trial Transcript at 21; Exhibit C at 52. When further discussing the value of the Ligonier Property, Debtor Husband explained that the property is unimproved, comprised of wooded hillsides, and does not have utilities. *See* Trial Transcript at 27.

Seemingly relying on Mr. Knupp's estimations, Debtor Husband stated that he repeatedly described the Ligonier Property as ten acres and the value as approximately $1000 per acre on forms

submitted to financial institutions, including those prepared for the Original Lender. *See* Trial Transcript at 18, 20-21, 37-38. In support thereof, in April of 2019, Debtor Husband described the Ligonier Property as "10 Acres Land – Ligonier, PA" and listed the value as $11,000 on his *Personal Financial Statement* that was sent to the Original Lender relating to the Mortgage. *See* Trial Transcript at 36-38; Exhibit 1 at 2. Although this is a $1000 difference, the Court finds it substantially similar enough to credibly support Debtor Husband's explanation. Debtor Husband testified that financial statements, similar to Exhibit 1, were prepared each year for the Original Lender describing the Ligonier Property in the same fashion. *See* Trial Transcript at 37-38.

Further, Debtor Husband testified that even after obtaining the Market Analyses, although he recognized that real estate professionals "have valuable opinions," he still did not believe that the true value of the Ligonier Property would be known until it was sold to another party or disposed of by the Court due to the current condition of the property. *See* Trial Transcript at 26-27, 47. Ultimately, Debtors' Schedule A/B was never amended to indicate the Ligonier Property's actual acreage or to reflect the higher estimated value by taking the Market Analyses into consideration. Rather, Debtor Husband contends that the information was provided to the Trustee in order for her to make a determination. *See id.* The Court found Debtor Husband's testimony and explanations related to the acreage and value discrepancies on the filed Schedule A/B to be credible.

Oil and Gas Lease and Related Royalties

Schedule G instructs a debtor(s) to disclose whether they are a party to an executory contract or unexpired lease. In the case at hand, Debtors checked the box indicating that they were *not* a party to an executory contract or an unexpired lease. *See* Exhibit A at 32. Despite not listing any executory contracts or unexpired leases on their filed Schedule G, Debtors are in fact lessors under a Paid-Up Oil and Gas Lease ("Oil and Gas Lease") executed in favor of XTO Energy Inc., which

describes the Ligonier Property and references the Deed. *See* Exhibit F at 97-104; Trial Transcript at 29-30. Debtors jointly entered into the Oil and Gas Lease *after* the Deed conveyed the Ligonier Property to them as husband and wife. *See id.* Although the Oil and Gas Lease had an initial term of 5 years, commencing April 10, 2009, Debtor Husband confirmed at Trial that the lease was in full force and effect at the time the Debtors filed their schedules due to ongoing operations. *See* Exhibit F at 97; Trial Transcript at 30. LWBC alleges that "[t]he Debtors' omissions regarding [the Oil and Gas Lease], including the existence of the aforesaid lease and all income derived therefrom, were knowingly false." *See* Complaint at ¶ 27.

Directly related to the Debtors' omission of the Oil and Gas Lease on their Schedule G, Schedule I directs a debtor(s) to disclose all monthly income which would include any and all royalty payments paid in accordance with an active oil and gas lease. Despite omitting all information related to any royalty income on their filed Schedule I, Debtor Husband admitted that Debtors have received royalties under the Oil and Gas Lease since at least 2017. *See* Exhibit A at 39-41; Trial Transcript at 31. Rather than random or sporadic royalty payments, which would still have to be disclosed on a debtor's Schedule I, Debtors receive consistent monthly royalty checks from XTO Energy, Inc., the lessee of the Oil and Gas Lease, along with coordinating statements. *See* Exhibit G at 105-191. At Trial, Debtor Husband indicated that the Debtors received royalty checks both three days before the filing of the Main Case and twenty-eight days afterward. *See* Exhibit G at 147, 149; Trial Transcript at 31-32. He estimated that the annual royalties generated by the Oil and Gas Lease for the years 2021 and 2022 would likely range between $800 and $1700. *See* Trial Transcript at 32.

Even though Debtor Husband made these admissions on the record, Debtors still failed to list the royalty income on their filed Schedule I. *See* Exhibit A at 39-41; Trial Transcript at 32.

While Debtor Husband acknowledged at Trial that the Oil and Gas Lease should have been disclosed, the schedules were never amended to correct these errors. *See* Exhibit A at 32, 39-41; Trial Transcript at 30, 47-48. Instead, Debtor Husband explained that copies of the omitted Oil and Gas Lease and royalty statements were only provided to the Trustee after the Meeting of Creditors. *See* Trial Transcript at 42. The complete failure of the Debtors to provide any explanation, let alone a plausible explanation, for the omissions of the Oil and Gas Lease and related royalties on Debtors' Schedules G and I is significant. Further, the explanation for the failure to amend is unconvincing.

   <u>Firearm Transfers</u>

   Part 7 of a SOFA requires a debtor(s) to disclose all transfers of property made within two years of filing for bankruptcy, other than property transferred in the ordinary course of one's business or financial affairs. In Debtors' initially filed SOFA, the Debtors answered "No" to this question. *See* Exhibit B at 49. However, contrary to their original averment, in 2020 Debtors transferred three firearms, a Keltec KSG 12-guage shotgun, a Tavor X95 rifle, and a Steyr Scout bolt-action rifle, to third parties for a total purchase price of $3750. *See* Trial Transcript at 33-34; Exhibit 3 at 16. LWBC alleges that "[t]he statements made by the Debtors in their Statement of Financial Affairs related to the pre-petition transfer of the [f]irearms were knowingly false." *See* Complaint at ¶ 33.

   Debtor Husband testified that it was only after LWBC's Counsel raised questions at the Meeting of Creditors as to whether all firearm transfers were disclosed on the initial SOFA that Debtors realized the previous firearm transfers had been omitted. *See* Trial Transcript at 39-40. However, Debtors are not arms dealers where the accidental nondisclosure of three firearm transfers may not be readily apparent. On June 18, 2021, being 39 days after the Meeting of Creditors, Debtors' SOFA was amended to include the three firearm transfers. *See* Trial Transcript at 34;

Exhibit 3 at 16. The testimony establishes that the schedules were repeatedly reviewed for the inclusion of firearms. *See* Trial Transcript at 40. Nonetheless, the firearm transfers were omitted. Debtors failed to provide a credible explanation as to why the firearm transfers were omitted from the initially filed SOFA or give a justification as to why these transfers were only disclosed after LWBC's Counsel questioned the Debtors at the Meeting of Creditors. Based on the foregoing facts, the Court considers LWBC's objection to Debtors' discharge.

## Conclusions of Law

As set forth in the Complaint, LWBC is objecting to the Debtors' discharge pursuant to 11 U.S.C. §727(a)(4)(A). "Although objections to discharge are liberally construed in favor of the debtor, a discharge is a privilege intended only for the honest but unfortunate debtor." *See Marchitello v. Gutierrez (In re Gutierrez)*, 636 B.R. 624, 632 (Bankr.W.D.Pa. 2022) (citing *Melaragno v. Lybrook (In re Lybrook)*, 544 B.R. 537, 543 (Bankr.W.D.Pa. 2015)). A discharge may only be denied in extraordinary circumstances. *See id.* (citing *Lepre v. Milton (In re Milton)*, 595 B.R. 699, 709 (Bankr.W.D.Pa. 2019)). Section 727(a)(4)(A) mandates the denial of a debtor's discharge if "the debtor knowingly and fraudulently, in or in connection with a case…made a false oath or account[.]" This provision's intention is "to ensure that the debtor provides honest and reliable information to the trustee and others interested in the administration of the bankruptcy estate without their having to conduct costly investigations to discover the debtor's true financial condition." *See Gutierrez*, 636 B.R. at 632 (quoting *Walnut Meadows, LLC v. Tzabari (In re Tzabari)*, 622 B.R. 332, 340 (Bankr.E.D.Pa. 2020)). To bring a successful §727(a)(4)(A) action, LWBC must prove the following elements by a preponderance of the evidence:

(1) the debtor made a statement under oath;

(2) the statement was false;

(3) the debtor knew the statement was false;

(4) the debtor made the statement with the intent to deceive; and

(5) the statement related materially to the bankruptcy case.

*See id.* at 632-33 (citing *Lybrook*, 544 B.R. at 544). Based on the foregoing, the Court considers the testimony of Debtor Husband, the admitted exhibits, and the record in this case to determine whether the above elements are met.

The Court chooses to collectively address the first element, being that "the debtor made a statement under oath." *See id*. As discussed in more detail above, LWBC identified several misstatements and omissions in Debtors' schedules and SOFA including the acreage and value of the Ligonier Property in Debtors' Schedule A/B, the omissions of the Oil and Gas Lease and related royalties in Debtors' Schedules G and I, respectively, and the initial omission of three firearm transfers in Debtors' SOFA. The schedules and SOFAs were signed by both Debtor Husband and Debtor Wife. The first element is easily met in relation to each of the above identified misstatements as statements and omissions made within filed schedules and statements of financial affairs are statements made under oath and thus can lead to denial of a discharge for the purposes of §727(a)(4)(A). *See Lybrook*, 544 B.R. at 544. The Court will also consider all statements made by Debtor Husband under oath during the Trial.

<u>Acreage and Value of the Ligonier Property</u>

In their Schedule A/B, Debtors listed the Ligonier Property as ten acres and having a current value of $10,000. The Court finds that these statements made under oath concerning the Ligonier Property are false. The Deed describes the property as containing 13.449 acres and the obtained Market Analyses estimate the value of the property as being much higher than $10,000. Also, Debtor Husband acknowledged during the Trial that the Ligonier Property contains 13.449 acres

and not ten acres, as disclosed on the Debtors' Schedule A/B. With this in mind, the Court must consider whether these false statements were knowingly false or the result of an honestly held belief.

A debtor knowingly makes a false statement if the debtor knows the statement to be false, the debtor makes the statement without belief in its truth, or the statement is made with reckless disregard for the truth. *See Tzabari*, 622 B.R. at 340. In this case, Debtor Husband credibly testified that it was his understanding at the time of completing the schedules, that the property was approximately ten acres. Additionally, Debtor Husband believably testified that he relied on the advice of his father-in-law when estimating the approximate value of the Ligonier Property. Due to the fact that Debtor Husband's father-in-law lives adjacent to the Ligonier Property, and because the father-in-law previously owned the property and was one of the grantors of the Deed, it is plausible that Debtor would base his assessment of value on his father-in-law's estimation. Relying on Debtor Husband's understanding of the estimated acreage and value of the Ligonier Property, it was also regularly reported by the Debtors on required financial forms that the property was approximately ten acres and worth $11,000. This too evidences a lack of intent to deceive as the amount is substantially similar to the amount set forth in the schedule.

Although the Debtors obtained Market Analyses estimating the value of the Ligonier Property as being significantly higher than $1000 per acre, these were not obtained until after the Meeting of Creditors and were not in the Debtors' possession at the time their Schedule A/B was completed. In addition, Debtor Husband stated that even after receiving the Market Analyses, while he acknowledged that they are based on the "valuable opinions" of real estate agents, he didn't believe that the true value of the Ligonier Property would be known until the property was sold. Due to the current state of the property, being unimproved, comprised of wooded hillsides, and

without utilities, it is conceivable that Debtors would believe that they would need to find a very specific buyer for the Ligonier Property and that the characteristics of the property could substantially decrease the offer price from a potential buyer.

The credible testimony of Debtor Husband relating to the Ligonier Property, coupled with the fact that Debtors repeatedly described the Ligonier Property the same way on forms submitted to financial institutions, including personal financial statements that were accepted by the Original Lender relating to the Mortgage, persuades the Court that the Debtors did not knowingly misrepresent the acreage and value of the property. Rather the Court believes that these statements were made as the result of honestly held beliefs. Therefore, the Court finds that the Debtors did not knowingly make a false statement on their schedules with regard to the Ligonier Property. Based on the foregoing, the Court will not address the remaining elements that need to be proven under §727(a)(4)(A) as far as they relate to the acreage and value of the Ligonier Property.

<u>Oil and Gas Lease and Related Royalties</u>

Debtors indicated on their filed Schedule G that they were not a party to an executory contract or unexpired lease at the time they filed for bankruptcy and did not list any lease-related income on their Schedule I. The Court finds that these statements made under oath are false. Debtors are in fact lessors under the Oil and Gas Lease and consistently receive monthly royalty payments. As a result, the Debtors made false statements on their filed Schedules G and I due to these statements/omissions.

As for the third element of the §727(a)(4)(A) analysis, an objecting party may also prove that the debtor knowingly made a false statement by demonstrating that the debtor knew the statement at issue was false but nonetheless intentionally swore to its truthfulness. *See Tzabari*, 622 B.R. at 340 (citing *Giansante & Cobb, LLC v. Singh (In re Singh)*, 433 B.R. 139, 154

(Bankr.E.D.Pa. 2010)). Debtors knew that they were lessors under the Oil and Gas Lease and therefore knew that the submitted schedules were knowingly false due to the above-stated omissions. The Oil and Gas Lease is not a historical lease that was executed years prior to the Debtors' ownership. To the contrary, Debtors jointly executed the Oil and Gas Lease less than five months *after* the Deed was executed conveying the Ligonier Property to them as husband and wife. Further, Debtor Husband confirmed at Trial that the Oil and Gas Lease was in effect at the time the schedules were filed due to ongoing operations. It is noteworthy that the Debtors received royalty payments and coordinating statements both three days before filing for bankruptcy, and twenty-eight days after the filing, and yet still failed to disclose any information pertaining to the Oil and Gas Lease on their schedules. Therefore, there is no question that, given the above facts, Debtors knew they were lessors under the Oil and Gas Lease, they were given monthly reminders of their schedule omissions by way of the issued royalty checks and statements, and yet still failed to later amend their schedules to correct these false statements. At the very least, this demonstrates a reckless disregard for the truth. Therefore, this element has been satisfied.

With respect to the fourth element of whether there was an intent to deceive, a Court may infer fraudulent intent as

> [t]he problems inherent in ascertaining whether a debtor has acted with fraudulent intent are obvious. Ordinarily, the debtor will be the only person able to testify directly concerning his intent. Because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of a case.

*See Wachovia Bank, N.A. v. Spitko (In re Spitko)*, 357 B.R. 272, 314 (Bankr.E.D.Pa. 2006) (quoting *Williamson v. Fireman's Fund Ins. Co. (In re Williamson)*, 828 F.2d 249, 252 (4th Cir. 1987)). After considering the facts of this case, specifically that Debtor Husband admitted that the Oil and Gas Lease and related royalties should have been listed in their schedules, and the Debtors failed

to initially list them and failed to file amended schedules to correct these omissions, the Court infers that the Debtors must have had, and did have, a fraudulent intent when they omitted them from their schedules. Debtor Husband failed to give any other credible explanation for the failure to disclose these assets.

The final element under §727(a)(4)(A) focuses the analysis on the materiality of the false statements at issue. A statement is material if "the subject matter of the false oath 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.[']" *See Lybrook*, 544 B.R. at 548 (quoting *Cadle Co. v. Zofko*, 380 B.R. 375, 383 (W.D.Pa. 2007)). Debtors argue that the lease income is irregular and irrelevant.[8]  However, this is simply not true. Debtors have received consistent monthly royalty payments and accompanying statements since at least 2017. Debtor Husband estimated that the annual royalties generated by the Oil and Gas Lease for the years 2021 and 2022 would likely range between $800 and $1700. While the Court realizes that the royalty income does not amount to several hundred dollars each month, it certainly is not nominal. Regardless, "[t]he omission of assets having even little value can be material, and proof of actual harm to creditors caused by the omission is not necessary." *See Gutierrez*, 636 B.R. at 635 (quoting *Lybrook*, 544 B.R. at 548). Therefore, the Court finds that because the omissions of the Oil and Gas Lease and royalties on the Debtors' schedules relate to or involve ownership interests that directly bear a relationship to the Debtors' assets, the "materiality" prong of §727(a)(4)(A) has also been satisfied.

---

[8]    Specifically, Debtors argue that "[t]he lease income is irregular and irrelevant for purposes of *means testing*...." *See Defendants' Proposed Findings of Fact and Conclusions of Law*, Doc. No. 39 at ¶ 10 (citing Trial Transcript at 33) (emphasis added). While this argument related to the means test was raised in Debtors' *Answer to Complaint* (Doc. No. 8 at ¶ 26), it was not raised or explained in further detail at Trial. Additionally, although Debtors' Counsel's cited to page 33 of the Trial Transcript, the Court is unable to find mention of the means test anywhere within the Trial Transcript, including page 33. Nevertheless, the means test is completely irrelevant to the issue of whether or not the Debtors completely and accurately disclosed all of their assets on their schedules and SOFA.

<u>Firearm Transfers</u>

In Part 7 of Debtors' initially filed SOFA, Debtors indicated that within two years before they filed for bankruptcy, the Debtors did not sell or otherwise transfer any property to anyone, other than property transferred in the ordinary course of their business or financial affairs. Notwithstanding this answer on their SOFA, in 2020 Debtors transferred three firearms, a Keltec KSG 12-guage shotgun, a Tavor X95 rifle, and a Steyr Scout bolt-action rifle, to third parties for a total purchase price of $3750. Therefore, the Court finds that Debtors made false statements on their initially filed SOFA due to the omission of these firearm transfers.

With respect to the third element of the §727(a)(4)(A) analysis, in consideration of the Trial testimony, the Court concludes that the Debtors either knew that the statements in relation to the firearm transfers were false or made them with reckless disregard for the truth when they omitted the firearm transfers on their SOFA. The Court did not find Debtor Husband's testimony at Trial regarding these omissions credible. Debtor Husband testified that the schedules and SOFA had been repeatedly reviewed to make sure there was a full disclosure of the firearms and indicated that the information had been discussed with Debtors' attorney but was still mistakenly omitted. If this were true, Debtors would have immediately recognized that the firearm transfers were not listed because there were no firearm transfers listed on the initial SOFA. Based on the Trial testimony, the Court must conclude that the Debtors knew that the firearm transfers needed to be disclosed, the documents were repeatedly reviewed to ensure that the firearms were addressed, Debtors must have noticed that the firearm transfers were in fact not disclosed, and the Debtors' SOFA was filed without disclosing those transfers. Additionally, the Trial testimony insinuates that there were so many firearm transfers listed within the SOFA that even after repeatedly reviewing the draft documents, the three specific firearm transfers outlined above were inadvertently omitted.

However, this is not the case. Debtors are not arms dealers where the accidental nondisclosure of the transfer of three firearms may not be readily apparent to them. The initial SOFA did not list any property transfers at all, let alone numerous firearm transfers. This causes the Court to further question the credibility of the testimony on this point. Therefore, the Court finds that the third element of the §727(a)(4)(A) analysis has been satisfied.

Relating to whether there was an intent to deceive, "[f]raudulent intent may be proven by circumstantial evidence or inferred from a pattern of nondisclosure and concealment." *See Gutierrez*, 636 B.R. at 634 (quoting *Singh*, 433 B.R. at 154). It was only after questions were raised by LWBC's Counsel at the Meeting of Creditors that the SOFA was amended to include the three firearm transfers. When considering the omissions of the firearm transfers in light with the numerous other errors contained within the Debtors' filed documents[9] and the Debtors' explanations provided at Trial through the testimony of Debtor Husband, the Court concludes that these false statements were not the result of an innocent mistake made by the Debtors but were instead made with an intent to deceive thereby hindering the investigation into their assets.

Lastly, as explained above, the final element under §727(a)(4)(A) is materiality. This Court has little issue concluding that the omission of the three firearm transfers meets the test for materiality. The three firearm transfers, totaling $3750, clearly bear a relationship to the Debtors' assets and concern the existence and disposition of their property. Therefore, the "materiality" prong of §727(a)(4)(A) has been satisfied.

---

[9]     On April 14, 2021, Debtors also amended their Schedule B before the Meeting of Creditors to add a Delaware Life Insurance Company annuity and two American National term life insurance policies that were omitted from their initially filed Schedule B. *See* Exhibit 2 at 9-10.

Denial of Discharge

After taking into consideration the Trial testimony, the admitted exhibits, and the record in this case, the Court concludes that LWBC has met its burden and the Debtors must both be denied a discharge.[10]

> The denial of discharge is a drastic remedy and is a step this Court does not take lightly. However, it is [a] [d]ebtor's obligation to provide honest and reliable information rather than burden the trustee or creditors with an investigation into her financial condition. A discharge is a privilege reserved for the honest debtor, and the operation of the bankruptcy system requires candor.

*See Gutierrez*, 636 B.R. at 636 (citing *Lybrook*, 544 B.R. at 552). While some assets, like the firearm transfers, were eventually disclosed in the amended SOFA after the Debtors were questioned by LWBC at the Meeting of Creditors, Debtors' schedules were never amended to account for other assets such as the Oil and Gas Lease and related royalties. Debtor Husband argued that the Debtors never intended to deceive the Trustee or the Court because "[a]ny time there's been a question that has arisen, we've looked into, we've tried to amend the record to reflect." *See* Trial Transcript at 44. Amending one's schedules and SOFA "does not excuse the initial failure to disclose nor [does it] provide a defense to an objection to discharge under section 727(a)(4)." *Moore v. Strickland (In re Strickland)*, 350 B.R. 158, 164 (Bankr.D.Del. 2006). Furthermore, in what appears to the Court to be a pattern of behavior by the Debtors, only when omissions or misstatements were identified by LWBC did Debtors either amend their schedules and/or supply that information to the Trustee. *See* Trial Transcript at 26, 42, 43, 47. Although Debtors eventually disclosed omitted information to the Trustee in this case and entered into the Settlement Agreement,

---

[10] The Court notes LWBC's reliance on *Michener v. Brady (In re Brady)*, 234 B.R. 652 (Bankr.E.D.Pa. 1999), *aff'd*, 243 B.R. 253 (E.D.Pa. 2000). However, the Court does not find that particular case persuasive in this context. Nonetheless, the Court agrees that Debtor Wife must be denied a discharge based on the clear record of this case.

this does not absolve the Debtors of their actions which prevented the full disclosure of their assets to all of their creditors.

Debtor Husband attempted to further justify the omissions in the filed schedules and SOFA due to the pressures of the COVID-19 pandemic, personally having COVID-19 at the time the bankruptcy filing was prepared, and a back injury. *See* Trial Transcript at 44. While this Court is certainly empathetic, these unfortunate events do not explain why Debtors' SOFA was only amended after the Meeting of Creditors or why Debtors' Schedules G and I were never corrected by amendment once Debtors were made aware of the deficiencies in their filings. The overall lack of transparency and absence of credible explanations for the discrepancies ultimately led the Court to its decision.

Additionally, because LWBC provided clarification that relief is being sought against both Debtor Husband and Debtor Wife, the Court will address this issue. "[I]t is [a] [d]ebtor's duty to file accurate schedules and value his assets correctly." *See Fraser v. CitiMortgage, Inc. (In re Fraser)*, 599 B.R. 830, 837 (Bankr.W.D.Pa. 2019).

> A debtor may not insulate himself from accusations of fraud by failing to read the bankruptcy schedules prior to signing. '[A] debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath.' Debtors have a duty to carefully review the information included in their schedules and statements and insure that the information is accurate and complete.

*See Office of the U.S. Tr. v. Zimmerman (In re Zimmerman)*, 320 B.R. 800, 806 (Bankr.M.D.Pa. 2005) (citations omitted). Here, *both* Debtors signed under penalty of perjury that they had read the information contained within the filed documents, such information was true, and acknowledged that married couples filing for bankruptcy are *equally responsible* for supplying correct information therein. No argument or evidence was provided in order to persuade this Court that in light of the evidence provided by LWBC, that a denial of discharge shall apply only to the Debtor Husband, or

that Debtor Wife is not equally responsible for the false statements contained within the schedules and the nondisclosure of items within the same.

If either the Oil and Gas Lease *or* the royalties had been disclosed on the Debtors' schedules, it would have appeared more plausible to the Court that one or the other had been unintentionally omitted. However, this is not the case. Further, "[h]ad there been a single omission promptly corrected or a satisfactory explanation provided, denial of discharge may not be appropriate." *See Gutierrez*, 636 B.R. at 636. In this case, Debtor Wife offered no explanation in the face of overwhelming circumstantial evidence of the intent to defraud. The evidence is particularly compelling with respect to the Oil and Gas Lease and royalties, where there is no question Debtor Wife was aware of the lease as a signatory and the royalties which she undeniably, routinely received. Debtor Wife's knowledge of the Oil and Gas Lease and royalties cannot be denied based on this record. Additionally, disclosure of the Oil and Gas Lease and related royalties would likely have made the Ligonier Property more valuable to the Trustee.[11] The Court notes that the Ligonier Property already appears to be undervalued, though the Court gave the Debtors the benefit of the doubt on that point based on Debtor Husband's credible testimony at Trial and the consistent treatment of the property prior to the bankruptcy filing. Furthermore, although the Court was only presented with the testimony of Debtor Husband at Trial, Debtor Wife signed the amended SOFA which reflected the firearm transfers and that, taken in conjunction with the other nondisclosures, is consistent with a pattern of nondisclosure and concealment evidencing an intent to deceive. The

---

[11]    Debtor Husband admitted at Trial that the Oil and Gas Lease "contributes to the value of [the Ligonier Property]." *See* Trial Transcript at 32-33. However, when asked whether the disclosure of the Oil and Gas Lease and royalties would "raise the likelihood that the Trustee would be interested in pursuing a sale of [the] property," Debtor Husband was purposefully evasive replying "I have no idea what the Trustee would have found of interest." *See* Trial Transcript at 33. The Court did not find Debtor Husband's testimony to be credible on this point. Further, the Court finds the likely increase in value to be the most plausible explanation for this omission.

Court is convinced that she is equally complicit in the failure to disclose. Therefore, both Debtor

Husband and Debtor Wife are denied a discharge in this case.[12]

### **Conclusion**

Based on the foregoing, the Court finds that the Debtors are not entitled to a discharge in

this case and their discharges are denied pursuant to 11 U.S.C. §727(a)(4)(A).[13] An Order will be

entered consistent with this Memorandum Opinion.

Date:  <u>August 26, 2022</u>                         <u>/s/ Carlota M. Böhm</u>
                                                       Carlota M. Böhm
                                                       Chief United States Bankruptcy Judge


                                                       FILED
                                                       8/26/22 10:22 am
                                                       CLERK
                                                       U.S. BANKRUPTCY
                                                       COURT - WDPA

---

[12]    In addition to the request to deny the Debtors' discharge pursuant to 11 U.S.C. §727(a)(4)(A), the Complaint also seeks this Court to "determine that the debt owed to LWBC … – and as otherwise set forth in Proof of Claim 14 – is non-dischargeable." *See* Complaint, ¶ 45. However, no separate count is stated within the Complaint, and no reference to a particular applicable section of 11 U.S.C. §523 is identified. Furthermore, the Court determines that the additional relief sought is now unnecessary as the Debtors are not entitled to a discharge of any of their debts in this case. Clarification was provided at Trial that LWBC is only seeking relief subject to §727(a)(4)(A). *See* Trial Transcript at 10.

[13]    The Complaint also requests the Court to "award all costs and/or attorneys' fees to which LWBC may be entitled, and grant such other relief as is necessary and appropriate." *See* Complaint at 8. However, this request is only made in the "Wherefore" clause of the Complaint and no clear legal argument was presented within the pleadings or during Trial. Further, the proposed *Order of Court* (Doc. No. 4) filed by LWBC regarding the Complaint does not include any language that could be interpreted as requesting costs and/or attorneys' fees. Therefore, the Court does not address that request herein nor does the Court find any basis for granting such relief.